UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DENISE A. WARE, | ) |
| | ) No. 14 CV 4458 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) |
| | ) |
| | ) May 16, 2016 |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER

Denise Ware filed an application for Supplemental Security Income ("SSI") alleging that she is disabled because of depression, arthritis, post-traumatic stress disorder ("PTSD"), and scoliosis. After the Commissioner of the Social Security Administration ("SSA") denied her application, Ware filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Ware's motion is denied, the government's motion is granted, and the Commissioner's decision is affirmed:

## Procedural History

Ware filed her SSI application on March 15, 2011, alleging a disability onset date of February 22, 2011. (Administrative Record ("A.R.") 125, 141-48.) Her claim was denied initially on June 9, 2011, and on reconsideration on October 13, 2011. (Id. at 76-77.) Ware requested and was granted a hearing before an Administrative Law Judge ("ALJ") which took place on July 5, 2012. (Id. at 38-75, 89-90.) On

December 26, 2012, the ALJ issued a decision finding that Ware is not disabled and thus not entitled to SSI. (Id. at 16-29.) When the Appeals Council denied review on May 1, 2014, the ALJ's decision became the final decision of the Commissioner. (Id. at 1-3); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Ware filed this action seeking judicial review, (R. 3); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 8); *see* 28 U.S.C. § 636(c).

## Facts

Ware, who was 54 years old at the time of the hearing, has lived a troubled life. She was the victim of abuse at a young age, and more recently witnessed the shooting of her grandson and his friend. She suffers from a variety of mental illnesses, which have at times led to hospitalizations. In spite of these difficult circumstances, Ware found work as a mail sorter from 1996 to 1998 and as a cashier from 1999 to 2000. Ware claims that she became unable to work in February 2011 because of a disabling combination of mental and physical impairments. She supplied documentary and testimonial evidence in support of her claim.

### A. Medical Evidence[1]

Ware was hospitalized at Tinley Park Mental Health Center from February 22, 2011, through March 4, 2011, after reporting suicidal thoughts. (A.R. 187-93.) She told the treatment providers there that she began feeling depressed and had thoughts about hurting herself after she witnessed a shooting involving her grandson and his friend. (Id. at 190.) Upon admission, Ware was diagnosed with

---

[1] Because Ware only challenges the ALJ's decision with respect to her mental limitations, the court limits its summary of the medical evidence to her mental health records.

2

depressive disorder, PTSD, cannabis abuse, and scoliosis. (Id. at 188.) According to her treatment records, Ware "adjusted well" during her stay and "her depression started improving" when she began taking medication. (Id. at 189.) By the time she was discharged, she denied auditory hallucinations and no longer had thoughts of harming herself or others. (Id.) Her discharge records note that Ware's prognosis was "good," that she was alert and in a happy mood, and that she was not clinically depressed or suicidal. (Id.)

The following month, on April 11, 2011, Ware was referred to Stroger Hospital for depression and because she was hearing voices. (Id. at 248.) She reported that she hears her grandson's voice "all the time" and described feeling nervous and afraid to leave her house. (Id.) Ware told her attending physician that she suffers these episodes around four times a week. (Id.) After her evaluation, Ware was advised to seek group therapy and to continue her medications, which consisted of Abilify, Trazadone, and Zoloft. (Id. at 251.) Her suicide risk at discharge was recorded as "minimal." (Id.)

In June 2011, Dr. Henry Fine completed a psychiatric evaluation for the Bureau of Disability Determination Services ("DDS") and found that Ware suffers from PTSD and depression. (Id. at 198, 201.) Dr. Alexander Panagos conducted a consultative examination on the same day for DDS and also diagnosed Ware with PTSD. (Id. at 202-05.) Also in June 2011, Dr. Glenn Pittman completed a Psychiatric Review Technique form and a mental residual functional capacity ("RFC") assessment. (Id. at 206-23.) Dr. Pittman noted that Ware had been

3

diagnosed with PTSD and had reported symptoms consistent with PTSD. (Id. at 218.) He also noted that she has difficulty with memory and concentration and found that Ware had a "different story about the [grandson's] shooting episode with every interview." (Id.) In his mental RFC assessment, Dr. Pittman opined that Ware was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and perform activities within a schedule. (Id. at 220.) He also found Ware to be moderately limited in her ability to interact appropriately with the general public and her ability to set realistic goals or make plans independently of others. (Id. at 221.) Dr. Pittman wrote that her activities of daily living indicate that she feels depressed but that evaluations from Stroger Hospital seemed "exaggerated compared to hospital [notes]." (Id. at 222.) He ultimately concluded that she is capable of performing "simple, unskilled work." (Id.)

Ware attended therapy sessions for her major depressive disorder at Auburn Gresham Mental Health Center from April 2011 through September 2011. (Id. at 260-62, 267, 290.) Throughout her treatment there she reported feeling sad and depressed, but her therapists consistently noted the absence of anxiety, psychotic, and psychomotor symptoms. (See, e.g., id. at 265, 269, 277, 280, 283.) She received medication education and was told to continue complying with her medication regimen. (See, e.g., id. at 265, 267, 281.) Her treatment at Auburn was interrupted in September 2011, (id. at 290), after she attempted suicide by overdose, (id. at 339). She was admitted to Madden Mental Health Center at the end of September 2011

4

for about two weeks and discharged in October 2011. (Id. at 299.) During her initial psychiatric nursing assessment, Ware was noted to have logical and coherent thought processes, a cooperative and calm attitude, normal attention span and memory, and a clean appearance. (Id. at 341.) But it was also noted that she suffered from auditory hallucinations. (Id.) Ware admitted to being depressed but denied any suicidal ideation during the intake evaluation. (Id. at 337.) Ware ultimately was discharged after showing improvement, (id. at 299), and reporting that she had no suicidal ideations, (id. at 300). While Ware was still hospitalized at Madden Mental Health Center, Dr. Leon Jackson completed an Illinois Request for Medical Advice form and affirmed Dr. Pittman's prior determination that Ware is capable of performing unskilled work. (Id. at 292-94.)

Ware was admitted to Tinley Park Mental Health Center again in May 2012 reporting thoughts of suicide. (Id. at 397.) She was diagnosed with depressive disorder, cannabis abuse, and a history of PTSD. (Id. at 398.) She was placed on suicide watch, which ended after 24 hours without incident. (Id.) Ware was discharged about a week later without any psychotic symptoms. (Id. at 399.) Though she was still diagnosed with major depression and cannabis abuse at discharge, Ware's prognosis was reported as "good as long as the patient continued outpatient [treatment] and continued taking medication." (Id.) Her discharge records note that she "did not appear to be clinically depressed," demonstrated no psychotic symptoms, and was "asymptomatic." (Id.)

5

## B. Ware's Hearing Testimony

On July 5, 2012, Ware appeared for her scheduled hearing and testified before an ALJ. (A.R. 38-75.) She described her work history, stating that she has not worked for seven years and currently lives with her sister. (Id. at 44.) She previously worked as a mail sorter, and her responsibilities involved lifting and sorting trays of mail. (Id. at 45, 65.) She also worked as a cashier at a bookstore selling and rearranging books. (Id. at 48.) Ware testified that her last job was at a hotel, but she stopped working there after becoming sick from exhaustion. (Id. at 50.) She explained that she had problems "coming in late" and was terminated from her position. (Id.)

With regard to her mental impairments, Ware testified that she has suffered from depression and anxiety for a long time but that it was exacerbated after witnessing the shooting of her grandson. (Id. at 52.) She said that she sees a psychiatrist every month and tries to take her medication, but sometimes forgets. (Id. at 52-53, 66.) Ware also said that her medication makes her feel drowsy. (Id.) She testified that when she is depressed, she feels like hurting herself and hurting others. (Id. at 58.) She explained that her depression led her to attempt suicide by overdose on more than one occasion. (Id. at 54, 58.)

As for daily activities, Ware said that typically she stays in the house and helps her sister with household chores such as washing dishes and laundry. (Id. at 59.) Ware stated that she no longer cooks because in the past, she has forgotten food on the stove. (Id.) Ware testified that before her grandson's shooting, she used

6

to go out and socialize. (Id. at 63.) But she said that now she only leaves the house a couple of times a week to go to the store. (Id.) Ware explained that she is reluctant to leave the house because she "feels like something's going to happen" and she does not like being around people other than her family. (Id. at 64.) Ware also stated that she has trouble sleeping because of recurrent flashbacks involving her grandson. (Id.) These flashbacks, according to Ware, last around 10 to 15 minutes and she cannot focus on anything else during these episodes. (Id. at 65.) Ware told the ALJ that she smoked marijuana in the past to cope with insomnia, but had not done so recently. (Id. at 66.)

## C. Vocational Expert's Testimony

A vocational expert ("VE") testified at the hearing and provided his opinion with respect to the kinds of jobs a person with certain hypothetical limitations could perform. (A.R. 69-74.) The VE first categorized Ware's past jobs as a mail sorter and cashier as light, unskilled work. (Id. at 69-70.) Then the ALJ asked the VE whether a hypothetical individual with the following limitations would be able to perform Ware's past relevant work: could lift and carry 50 pounds occasionally and 25 pounds frequently; can be on her feet for about six hours in an eight-hour workday; can occasionally crouch, kneel, or crawl but is unable to work at heights or frequently climb ladders; cannot understand, remember, or carry out detailed job tasks; cannot perform a job requiring intense focus or concentration for extended periods; can have casual interaction with the general public; and may be expected to be off task for about seven percent of the time in an eight-hour workday. (Id. at 70-

7

71.) The VE testified that such an individual would be able to work as a mail sorter but not as a cashier because of the public contact involved. (Id. at 71.) The VE further opined that a mail sorter would be required to be on task about 85 to 90 percent of the workday and would not be able to exceed ten absences from work per year. (Id. at 72.) The ALJ next asked the VE whether an individual who is completely precluded from interaction with the general public or coworkers would be able to perform Ware's previous job. (Id.) The VE responded that the hypothetical person's inability to deal with coworkers would preclude all competitive employment. (Id.)

**D.     The ALJ's Decision**

On December 26, 2012, the ALJ issued a decision denying Ware's application for SSI. (A.R. 16-29.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 416.920(a), at steps one and two the ALJ determined that Ware had not engaged in substantial gainful activity since her application date and that her affective disorder and scoliosis constitute severe impairments. (A.R. 21.) At step three the ALJ determined that none of Ware's impairments meet or medically equal any listed impairment. (Id.) Before turning to step four, the ALJ determined that Ware has the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently, to be on her feet standing and walking about six hours in an eight-hour workday, and to sit about six hours with normal rest periods, but she is unable to understand or remember detailed and complex job tasks and may only have casual interaction with the public and superficial contact with coworkers. (Id.

at 23.) In so finding, the ALJ explained that he found Ware's description of her symptoms to be less than fully credible and that he gave great weight to the state consulting physicians who opined that Ware can perform simple, unskilled work at a medium exertional level. (Id. at 27-28.) At step four the ALJ determined that Ware's RFC allowed her to perform her past relevant work as a mail sorter. (Id. at 28.) Accordingly, the ALJ concluded that Ware is not disabled and therefore not entitled to SSI. (Id.)

## Analysis

Ware argues that the ALJ committed reversible error by failing to consider her PTSD and by improperly analyzing her credibility. (See R. 17, Pl.'s Mem. at 1.) This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Minnick v. Colvin,* 775 F.3d 929, 935 (7th Cir. 2015). But the court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether the applicant is disabled," *see Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a disability determination, the ALJ is required to "build an accurate and logical bridge between the evidence and the

9

result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

A.  **Symptom Evaluation**

The court first addresses Ware's argument that the ALJ improperly discredited her symptom allegations because an error in that analysis is often reason enough to reverse an ALJ's decision. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011). Ware argues that the ALJ was patently wrong to find her allegations unpersuasive based on a consulting examiner's opinion and on what he characterized as her "rapid improvement" with treatment. (R. 17, Pl.'s Mem. at 10-12.) More specifically, Ware contends that the ALJ should have credited her testimony that her PTSD prevents her from leaving home to attend work five days a week and that her frequent flashbacks would also preclude gainful employment. (Id. at 7.) Before going further, the court acknowledges the new Social Security Ruling that went into effect on March 28, 2016, which eliminated the term "credibility" from the ALJ's review of a claimant's symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *1 (March 28, 2016) (superseding SSR 96-7p). But even under the new SSR, the ALJ is still required to test the consistency of the claimant's statements in evaluating the severity of her symptoms by weighing familiar factors such as medical opinions, the claimant's daily activities, medications, and treatment attempts. *Id.* at *6-8.

Although the court ultimately finds here that the ALJ's symptom analysis withstands the deferential review it is owed, the court agrees with Ware that the

10

ALJ made some disconcerting missteps. For example, he noted that Ware showed "rapid improvement" each time she was hospitalized and received in-patient treatment. (A.R. 28.) But the ALJ should have considered that living in a highly structured setting makes it substantially easier to manage daily activities and comply with medication, and improvement with inpatient treatment is hardly a good indicator of how a person may function outside of that supportive setting. *See* POMS DI 22511.005 ("Highly structured and supportive settings may greatly reduce the mental demands placed on an individual. . . . At the same time, however, the individual's ability to function outside of such a structured and/or supportive setting may not have changed. An evaluation of individuals whose symptomatology is controlled or attenuated by psychosocial factors must consider the ability of the individual to function outside of such highly structured settings.") Furthermore, the ALJ's conclusion that Ware improved with treatment overlooks the fact that occasional reports of improvement may simply reflect that a person suffering from mental illness is likely to have good days and bad days. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *see also Punzio*, 630 F.3d at 710 ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.").

The ALJ also erred in other ways. For example, he drew a negative inference from Ware's failure to take her medications regularly, but did not explore whether she had good reasons for not fully complying with her prescribed regimen. *See Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014); *see also Martinez v. Astrue,* 630

11

F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently"). He made repeated references to Ware's cannabis abuse, but there is no evidence that she ever concealed her use of marijuana. (See A.R. 24-26); *cf. McClesky v. Astrue*, 606 F.3d 351, 353 (7th Cir. 2010) (finding that drawing a negative inference from a claimant's inconsistent statements about drug use could be justified where the claimant displayed a "lack of candor on [the] subject"). In fact, Ware's medical records reflect that she reported her marijuana use to her treatment providers, (see, e.g., A.R. 187, 191, 241, 336), and contrary to what the ALJ implies in his decision, her testimony at the hearing that she "no longer smoked marijuana" is not necessarily inconsistent with her testimony that "it had been 32 days since she last smoked[,]" (id. at 24).

Perhaps the ALJ's most disturbing error was when he suggested, both in his decision and at the hearing, that Ware's mental illness is not as severe as she alleges because "she took about six pills" in her suicide attempt "although there were about five or six more pills in the bottle that she did not ingest despite having the opportunity." (Id. at 25-26.) The ALJ's insensitivity, which manifested itself in multiple instances during the hearing, raises concerns regarding the ALJ's consideration of Ware's impairments. And even setting aside the lack of tact in the ALJ's questioning, "the fact that one overdoses on pills for reasons other than to kill oneself is not proof of mental stability, as the judge seemed to think." *See Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015).

Nevertheless, the ALJ's flawed symptom analysis is still sufficient to withstand scrutiny because he properly relied on consulting experts' uncontradicted opinions to conclude that Ware's symptoms are not as severe as she alleges. *See Filus v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012) (noting that ALJ did not err in relying on uncontradicted opinions from reviewing physicians). Not all of the ALJ's reasons for discounting symptom allegations must be valid as long as enough of them are, *see, e.g. Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009), and here the ALJ properly cited the opinion of Dr. Pittman, (A.R. 27). Dr. Pittman acknowledged Ware's PTSD diagnoses and her allegations that she "doesn't like to go outside" and "does not like to be social." (Id. at 218.) He opined that while Ware is moderately limited in her ability to interact appropriately with the general public and maintain attention and concentration for extended periods, she is nonetheless capable of performing simple, unskilled work. (See id. at 220-22.) Ware points to no opinion to the contrary. *See Halsell v. Astrue*, 357 Fed. Appx. 717, 723 (7th Cir. 2009) (stating that it is not improper for ALJ to draw negative inference from the fact that no treating physician opined that claimant is disabled). In fact, Ware submitted no opinion evidence from any of her treatment providers. It is ultimately Ware's burden to present medical evidence supporting her claim of disability, a burden she failed to meet here. *See Olsen v. Colvin*, 551 Fed. Appx. 868, 875 (7th Cir. 2014). And although Ware points to records of subsequent treatment and hospitalizations which occurred after Dr. Pittman provided his opinion, none of those records supports the specific limitations she alleges. Nor do the records contradict

Dr. Pittman's opinion, which was also confirmed by another state agency consultant. (See R. 17, Pl.'s Mem. at 11; A.R. 294.) Accordingly, the ALJ's finding that Ware's allegations regarding her symptoms are not fully supported by the medical evidence is not patently wrong.

**B.   Step-Two Determination and RFC Assessment**

Ware also argues that the ALJ erred because he failed to acknowledge her PTSD as a severe impairment at step two and did not account for limitations caused by her PTSD in his RFC determination. (R. 17, Pl.'s Mem. at 5-6.) While it is true that the ALJ did not include PTSD as a listed impairment at step two, (A.R. 21), so long as the ALJ moved beyond step two and "properly considered all of [her] severe and non-severe impairments, the objective medical evidence, her symptoms, and her credibility when determining her RFC," any error at step two is harmless. *See Curvin v. Colvin*, 778 F.3d 645, 649-50 (7th Cir. 2015). Here, the ALJ proceeded beyond step two and expressly acknowledged Ware's PTSD diagnoses in developing the RFC. (A.R. 24, 26.) Furthermore, he gave specific consideration to Dr. Pittman's opinion, which also referenced Ware's PTSD. (Id. at 218.)

In what amounts to a restatement of her previous argument, Ware contends that the ALJ failed to consider that her PTSD prevents her from leaving the house to attend work five days a week and that her frequent flashbacks compound the disruptive nature of her affective disorder. (R. 17, Pl.'s Mem. at 7.) Contrary to Ware's contention, the ALJ did acknowledge Ware's testimony that she does not like to leave her house, feels anxious around people other than her family members, has

14

flashbacks of her grandson's shooting, and occasionally hears her grandson's voice. (A.R. 24.) But he found based on Dr. Pittman's opinion and other evidence in the record that she is still capable of going out alone and performing simple, unskilled work. (Id. at 22, 24.) First, as already discussed, the ALJ relied on Dr. Pittman's opinion that despite Ware's aversion to going outside and her reports that she has intrusive thoughts, she is still able to work. (Id. at 218, 222.) The ALJ expressly referenced Dr. Pittman's findings that Ware showed no evidence of any confusion, delusions, or hallucinations. (Id. at 22.) Second, the ALJ pointed out that during many therapy sessions Ware displayed no signs of anxiety, psychomotor, or psychotic symptoms, and demonstrated goal-oriented thought process. (Id. at 22, 265, 269, 277, 280, 283.) Furthermore, Ware presents no evidence beyond her own testimony to indicate she would be more limited than the RFC that the ALJ assigned, *see Schreiber v. Colvin*, 519 Fed. Appx. 951, 962 (7th Cir. 2013), and as addressed above, the ALJ had a basis for concluding that Ware's symptoms are not as severe as she alleges, *see Michalec v. Colvin*, 629 Fed. Appx. 771, 775 (7th Cir. 2015) ("The only evidence contradicting Dr. Smith's opinion about Michalec's exertional limitations was his own subjective testimony, which the ALJ discredited based on Michalec's credibility problems."). Ware's argument that the ALJ failed to properly assess her functional limitations is therefore unavailing.

Ware's argument that the ALJ "did not adopt Dr. Pittman's opinion" because the ALJ found Ware more limited than the doctor is perplexing and also falls short. This is not a case where the ALJ rejected a physician's opinion and imposed lesser

15

limitations on a claimant's RFC without detailing any medical evidence supporting those abilities. *See Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009). To the contrary, the ALJ determined that Ware's RFC is even more limited than the RFC Dr. Pittman assigned to her and includes additional restrictions. Insisting that the ALJ's decision is erroneous here because the ALJ did not strictly adopt Dr. Pittman's opinion is misguided, and Ware cites no authority indicating otherwise.

Ware also argues that the ALJ should have solicited an updated opinion from another medical expert because Dr. Pittman did not consider Ware's more recent treatment records. (R. 17, Pl.'s Mem. at 11.) But as the Seventh Circuit has made clear, "although ALJs bear some responsibility for developing the administrative record . . . they are also free to assume that a claimant represented by counsel has presented her strongest case for benefits." *See Buckhanon v. Astrue*, 368 Fed. Appx. 674, 679 (7th Cir. 2010). Where a claimant represented by counsel neither asks the ALJ to re-contact the state-agency consultants nor submits any opinion from a treating physician, the "appropriate inference is that [the claimant] decided that another expert opinion would not help her." *Id.* Thus where, as here, the ALJ reviews the entire record and expressly relies on the uncontradicted opinions of state-agency consultants, that decision is supported by substantial evidence. *See id.*; *see also Filus*, 694 F.3d at 867 (noting that ALJ is entitled to accept state consulting physicians' opinions where no contradictory medical opinions in record); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (observing that ALJ's duty to

make complete record "can reasonably require only so much" because "no record is 'complete'—one may always obtain another medical examination, [or] seek the views of one more consultant" (quotation and citation omitted)).

Ware more persuasively argues that the ALJ had no basis or explanation for his determination that Ware would be off task for seven percent of the workday. (R. 17, Pl.'s Mem. at 8.) Ware is correct that the ALJ did not explain how he arrived at that number, and the seven percent off-task time was not discussed by Ware's treatment providers or the state consultants. However, any error here is again harmless because Ware points to no evidence establishing that she would be off task for more than seven percent of an eight-hour workday. She references her own testimony that flashbacks would cause her to be off task for 10 to 15 minutes at a time, (A.R. 65), but cites no evidence outside of her own testimony to support her allegations. As discussed above, the ALJ adequately explained why he discounted her testimony describing her symptoms. Furthermore, Dr. Pittman acknowledged her concentration deficits and still opined that she is capable of performing simple, unskilled work over the course of a normal workday. (Id. at 220, 222.) In reaching that conclusion, he noted that Ware is moderately limited in some areas relating to sustained concentration and persistence, but is "not significantly limited" in most categories of mental activity within the context of a normal workday and workweek. (Id. at 220-22.) Although the court is sympathetic to Ware's ongoing struggles, she still bears the burden of presenting medical evidence to support her claim of

disability. *See Olsen*, 551 Fed. Appx. at 875. The ALJ did not commit reversible error in finding that she failed to meet that burden here.

## Conclusion

For the foregoing reasons, Ware's motion is denied, the government's motion is granted, and the Commissioner's decision is affirmed.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**